05-6541-ag
Pinto-Montoya v. Mukasey

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2007

(Argued: February 27, 2008                                              Decided: August 26, 2008)

Docket No. 05-6541-ag

EFRAULIO PINTO-MONTOYA and ISMAR PINTO-MONTOYA,

　　　　*Petitioners*,

　　　　v.

MICHAEL B. MUKASEY, Attorney General,[*]

　　　　*Respondent*.

Before: CABRANES, POOLER, AND SACK, *Circuit Judges*.

Petitioners seek review of an order of the Board of Immigration Appeals ("BIA") affirming an Immigration Judge's ("IJ") order of removal. The IJ denied petitioners' motion to suppress statements obtained after immigration officials allegedly seized them on the basis of their race and nationality for questioning at the airport. We conclude that petitioners' contact with immigration officials did not constitute a seizure within the meaning of the Fourth Amendment and, accordingly, their statements were properly admitted.

Petition denied.

> JON E. JESSEN, Stamford, CT, *for Petitioners*.
>
> SHANE CARGO, Assistant United States Attorney (Michael J. Garcia, United States Attorney, *on the brief*, Beth E. Goldman, Assistant United States Attorney, *of counsel*), United States Attorney's Office for the Southern District of New York, New York, NY, *for Respondent*.

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey is automatically substituted for former Attorney General Alberto R. Gonzales as respondent in this case.

PER CURIAM:

Ismar and Efraulio Pinto-Montoya petition for review of an order of the Board of Immigration Appeals ("BIA") denying petitioners' motion for reconsideration of a prior BIA order summarily dismissing their appeal. *See In re Pinto-Montoya*, Nos. A78 428 273, A78 428 277 (B.I.A. Oct. 28, 2005); *In re Pinto-Montoya*, Nos. A78 428 273, A78 428 277 (BIA Aug. 11, 2005), *aff'g In re Pinto-Montoya*, Nos. A78 428 273, A78 428 277 (Immig. Ct. N.Y. City, Feb. 24, 2004). The Immigration Judge ("IJ"), after concluding that petitioners had not been stopped or seized by immigration officials during an incident at the airport, denied petitioners' motion to suppress the statements they made to the officials and ordered them removed. On appeal, petitioners argue that (1) their encounter with immigration officials at the airport was a seizure within the meaning of the Fourth Amendment; and (2) that the alleged stop was sufficiently "egregious" to justify suppression of the evidence obtained because petitioners were stopped solely on the basis of their race and nationality.

We conclude that petitioners' contact with immigration officials at the airport was not a seizure within the meaning of the Fourth Amendment because no force, threat of force, or other assertion of authority was used by the officials. Because petitioners were not seized, the statements obtained from petitioners by the immigration officials were properly admitted.

## BACKGROUND

Petitioners, brothers who are natives and citizens of Guatemala, arrived at John F. Kennedy airport in New York on a flight from Los Angeles on February 8, 2001. As they disembarked from the plane, immigration agents in plainclothes approached them and asked them, in Spanish, about their immigration status. When petitioners admitted that they were in the United States illegally, the officers detained them and conducted additional questioning. As part of the questioning, both petitioners signed sworn statements conceding that they entered the United States unlawfully and were "in the United States in violation of U.S. immigration law."

2

Shortly after the events at the airport, the INS commenced removal proceedings against petitioners. Petitioners did not file applications for relief from removal or contest their status but, instead, moved to suppress the evidence obtained during their questioning at the airport on the basis that they had been stopped at the airport solely on the basis of their race and nationality. Respondents contended that petitioners were apprehended pursuant to a larger interdiction project conducted by the former Immigration and Naturalization Service ("INS"). In support of their position, respondents submitted a declaration from the agent who "signed off" on the form documenting petitioners' apprehension. Although the agent was not present when petitioners were interviewed and detained, he was the supervisor of the operation under which petitioners were selected for questioning.

The declaration explained that the INS, after "observ[ing] various trends in the routes taken by [aliens illegally smuggled into the country]," had developed a protocol for identifying and questioning suspected smugglers and their clients. Plainclothes agents would approach individuals as they were disembarking from a plane, ask whether they would be willing to speak to the agents, and permit them to walk away if they did not. If an individual agreed to speak to the agents, he would be taken to a separate area, where the agents would reveal their identities and ask him questions about his immigration status. According to the protocol, "[t]he questioning at this point would also be voluntary. If the [person] did not want to answer the questions [he] would be free to leave." Individuals who "provided sufficient information to establish alienage and removability" would be taken into custody and transported to an INS office for processing. The agent described the criteria used in the protocol as follows:

> In determining who would be identified for questioning, the protocol dictated that Agents look for passengers typically of Mestizo physical appearance (a person of mixed Spanish and American Blood [sic]) who would be inappropriately dressed in light of the season (i.e., they would not be wearing or carrying cold weather coats in the winter). The targeted people would also generally not have any baggage and bypass the baggage claim. They often would also carry airline issued food with them off the plane.

Petitioners arrived in New York on one of the flights identified by the INS as "likely to contain illegal aliens."

3

The IJ, after reviewing the parties' submissions on the appropriateness of suppression, held a hearing to take testimony from petitioners regarding the circumstances under which they were approached and questioned. Petitioners testified that they did not meet any of the criteria in the protocol other than choice-of-flight and racial characteristics; they were wearing jackets, had checked luggage, and did not take airline food with them. They further testified that, as they left the plane, they were approached by a man dressed in casual clothing who asked if they had "papers" and inquired whether they had "permission to stay in this country." Both answered these questions in the negative. Ismar Pinto-Montoya stated that he answered the questions rather than walking away because the individual asking the questions was standing in front of him and "could have pulled [him] back." Efraulio Pinto-Montoya stated that he agreed to speak with the agent because other passengers from the plane—all of whom were described by the Pinto-Montoyas as "Spanish"—were being questioned at the same time. Both petitioners testified that the immigration officials did not identify themselves as such until after petitioners admitted that they were in the country illegally. Petitioners were then transported to another location where they were questioned by the same agents and signed the statements conceding their unlawful entry.

Based on petitioners' testimony, the IJ concluded that the petitioners' contact with immigration officials at the airport was not a stop or seizure because they spoke to the agents voluntarily.

> [Petitioners] did not testify to any actions by the agent[s] that would be intimidating. There was no testimony that voices were raised or that threats were made. No one told [petitioners] that they had to answer the question[s] or that certain consequences would flow from not answering the questions.

The IJ also observed that the circumstances, as described by petitioners, were such that a reasonable person would have believed himself free to leave: the officers were in plainclothes, did not identify themselves as immigration officials and had no other physical indicia—for example, badges—identifying them as law enforcement officials. As the IJ noted: "For all [petitioners] knew the person who asked them about their status was a civilian. . . ." The IJ further concluded that even if

4

petitioners had been seized within the meaning of the Fourth Amendment, their detention and questioning was not so "egregious" as to justify suppression.

The BIA summarily dismissed petitioners' appeal, and petitioners filed a motion for reconsideration of that decision. After determining that "there was no stop or seizure at the airport" and that there was "nothing unreasonable or egregious about the officer[s'] encounter with the [petitioners]," the BIA denied petitioners' motion for reconsideration.

## DISCUSSION

"When the BIA briefly affirms the decision of an IJ and adopts the IJ's reasoning in doing so, we review the IJ's and the BIA's decisions together." *Wangchuck v. Dep't of Homeland Sec.*, 448 F.3d 524, 528 (2d Cir. 2006) (alteration and internal quotation marks omitted). We review the agency's legal conclusions *de novo*, *see Yi Long Yang v. Gonzales,* 478 F.3d 133, 141 (2d Cir. 2007), and its factual findings, including adverse credibility determinations, under the substantial evidence standard, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B); *see also Shu Wen Sun v. BIA*, 510 F.3d 377, 379 (2d Cir. 2007).

Our immigration laws permit an immigration official to "interrogate" without a warrant "any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). The applicable regulations governing "interrogation and detention not amounting to arrest," 8 C.F.R. § 287.8(b), state that

(1)     Interrogation is questioning designed to elicit specific information. An immigration officer, like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away.

(2)     If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.[1]

---

[1] The remainder of the provision states that

Information obtained from this questioning may provide the basis for a subsequent arrest, which must be effected only by a designated immigration officer, as listed in 8 C.F.R. § 287.5(c). . . .

8 C.F.R. § 287.8(b)(3).

Petitioners' claim raises the question of whether the exclusionary rule applies in immigration proceedings at all and under what circumstances it might apply. In criminal proceedings, evidence obtained as a result of an illegal seizure or an unlawful arrest is, of course, subject to the exclusionary rule. *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963); *Mosby v. Senkowski*, 470 F.3d 515, 520 (2d Cir. 2006). A removal proceeding, however, is "a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984); *see also* 8 U.S.C. § 1229a (governing removal proceedings). As a result, many of the protections afforded defendants in criminal proceedings are "'are not necessarily constitutionally required'" in immigration proceedings. *Felzcerek v. INS*, 75 F.3d 112, 115 (2d Cir. 1996) (quoting *Dor v. Dist. Dir., INS*, 891 F.2d 997, 1003 (2d Cir. 1989)).

In *Lopez-Mendoza*, the Supreme Court considered the applicability of the exclusionary rule to immigration proceedings. *See* 468 U.S. at 1039. After balancing the costs of exclusion against the likely social benefits, the Court ruled that the exclusionary rule does not apply. *See id.* at 1050 ("[W]e are persuaded that the . . . balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings held by the INS."). As the Court explained, the deterrence value of excluding evidence obtained by immigration officials by means of an allegedly unlawful search is "small" because the agency has already taken "sensible and reasonable" steps to deter such violations, *id.* at 1050—for example, providing proper training to new immigration officers, and investigating and punishing agents who commit Fourth Amendment violations, *id.* at 1044–45. On the other hand, "[t]he costs of applying the exclusionary rule in the context of civil deportation [proceedings] are high" because application of the rule would result in the release of persons whose continued presence in the country constituted a crime. *Id.* at 1050.

A plurality of the Court, in a separate section of the opinion, specifically reserved the question of whether an exclusionary remedy would be available "if there developed good reason to believe that

Fourth Amendment violations by INS officers were widespread"[2] or if immigration officials committed "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Id.* at 1050-51 (citing cases in which conduct of government officials violated the Due Process Clause). We have adopted the reservations of the *Lopez-Mendoza* plurality as part of the "the law of our circuit," holding that "exclusion of evidence is appropriate under the rule of *Lopez-Mendoza* if record evidence established either (a) that an egregious violation that was fundamentally unfair had occurred, or (b) that the violation—regardless of its egregiousness or unfairness—undermined the reliability of the evidence in dispute." *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 234, 235 (2d Cir. 2006). In addition, we have observed that "even where the seizure is not especially severe, it may nevertheless qualify as an egregious violation if the stop was based on race (or some other grossly improper consideration)." *Id.* at 235; *accord Melnitsenko v. Mukasey*, 517 F.3d 42, 47 (2d Cir. 2008); *but see Amedia-Amaral*, 461 F.3d at 237 (concluding that petitioner's mere assertion, without more, that he was stopped on the basis of race was insufficient to establish that the stop was race-based).

Respondents maintain that the Pinto-Montoyas were selected for questioning "at least in part[] because they arrived on a particular flight . . . known to be used for alien smuggling." Petitioners, however, contend that they were targeted solely on the basis of race. In addition, although the IJ and BIA both concluded that there was nothing unreasonable or egregious about the encounter between petitioners and the immigration officials, the affidavit of the special agent in charge of the operation indicates that "[i]n determining who would be identified for questioning, the protocol dictated that Agents look for passengers" who, *inter alia*, had a "Mestizo physical appearance."

---

[2] In their submissions to the Court, petitioners argue for the first time that Fourth Amendment violations by immigration authorities are so widespread as to make exclusion appropriate in these circumstances. Because they did not raise the issue before the BIA, it has not been exhausted and is therefore not appropriately before us. *See* 8 U.S.C. § 1252(d)(1); *Melnitsenko v. Mukasey*, 517 F.3d 42, 47 (2d Cir. 2008).

We need not consider whether a stop and seizure pursuant to the protocol might constitute conduct so egregious as to justify suppression because we conclude that, in the instant case, petitioners were not seized within the meaning of the Fourth Amendment. *Cf. INS v. Delgado*, 466 U.S. 210, 221 (1984) ("[Petitioners] may only litigate what happened to them, and our review of their description of the encounters with the INS agents satisfies us that the encounters were classic consensual encounters rather than Fourth Amendment seizures.").

The dispositive inquiry for determining whether the agents' contact with petitioners amounted to a seizure within the meaning of the Fourth Amendment is whether the encounter was consensual. *See id.; see also Florida v. Bostick*, 501 U.S. 429, 436-37 (1991) (discussing the holding and reasoning of *Delgado* with approval). "'[M]ere police questioning does not constitute a seizure.'" *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (quoting *Bostick*, 501 U.S. at 434). Rather, we must ask whether, under the particular circumstances presented, "a reasonable person would have believed that he was not free to leave if he [did] not respond[]" to the questions put to him. *Delgado*, 466 U.S. at 216; *accord United States v. Drayton*, 536 U.S. 194, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."); *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

Physical restraint or an assertion of authority to restrain a person's freedom of movement by law enforcement officers would, in most instances, constitute a seizure. *See, e.g., Brendlin v. California*, 127 S. Ct. 2400, 2405 (2007) ("A person is seized by [a law enforcement officer] and thus entitled to challenge the [officer's] action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement *through means intentionally*

8

*applied*." (internal quotation marks and citations omitted)). Petitioners' testimony before the IJ does not suggest that they were physically restrained, ordered to stop, or otherwise coerced to answer questions when the agents approached them. Nor can petitioners plausibly argue that they answered the agents' questions in response to an assertion of authority. Petitioners testified that they were not aware that the persons approaching them were law enforcement officers. Indeed, the agents were not dressed in uniform, did not display their badges, or otherwise identify themselves as immigration officials. *Cf. Drayton*, 536 U.S. at 204 (noting that the Supreme Court has "rejected the claim that the defendant was seized when an officer approached him in an airport, showed him his badge, and asked him to answer some questions" and, in addition, has held that immigration officials "wearing badges and questioning workers in a factory did not constitute a seizure").

Petitioners' contention that the agents were blocking the ramp and thereby restraining petitioners' freedom of movement does not compel a contrary conclusion. In *Delgado*, the Supreme Court considered and rejected a similar argument that stationing agents near the means of egress constituted a seizure of all of the people on the other side of the exit. As the Court explained:

> [T]here is nothing in the record indicating that . . . the agents at the doors actually [prevented people from leaving]. The obvious purpose of the agents' presence at the factory doors was to insure that all persons in the factories were questioned. The record indicates that the INS agents' conduct in this case consisted simply of questioning employees and arresting those they had probable cause to believe were unlawfully present in the factory. This conduct should have given respondents no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer. If mere questioning does not constitute a seizure when it occurs inside [a place], it is no more a seizure when it occurs at the exits.

*Delgado*, 466 U.S. at 218. For similar reasons, petitioners cannot argue that the agents' position at the end of the ramp resulted in the seizure of all of the people aboard the plane who had not yet entered the airport terminal, much less that they were seized as a result.

Petitioners have not argued that the immigration laws were violated or that the agents exceeded their authority to question aliens or persons believed to be aliens. *See* 8 U.S.C. § 1357(a)(1); *see also* 8

9

C.F.R. § 287.8(b)(1) ("An immigration officer, like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away.").  Nor do we find any record evidence of any such violation.

Because we conclude that petitioners were not seized within the meaning of the Fourth Amendment, we need not consider what role petitioners' racial characteristics played in the agents' decision to approach them for questioning.

## CONCLUSION

For the reasons stated above, the petition for review is denied.