04-3454-ag
Singh v. Mukasey

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

October Term 2008

Heard:  October 20, 2008                    Decided:  January 21, 2009

Docket No. 04-3454-ag

---

LAKHWINDER SINGH,

        Petitioner,

v.

MICHAEL B. MUKASEY,* Attorney
General of the United States, U.S.
Department of Homeland Security,

        Respondents.

---

Before:   KEARSE, SACK, and KELLY,** Circuit Judges.

---

        Lakhwinder Singh petitions for review of an order of the Board of

Immigration Appeals (BIA), which affirmed the decision of an immigration judge

(IJ), holding that he violated 8 U.S.C. § 1182(a)(6)(E)(i) and ordering him

---

        * Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney
General Michael B. Mukasey has been substituted for former Attorney General
John Ashcroft as a respondent in this case.

        ** The Honorable Paul J. Kelly, Jr., United States Court of Appeals for the
Tenth Circuit, sitting by designation.

removed from the United States. See In re Singh, No. A47 019 715 (BIA June 3, 2004), aff'g In re Singh, No. A47 019 715 (Immig. Ct. Buffalo, Mar. 25, 2003). On appeal, Petitioner argues that the IJ erred (1) in making unsupported credibility findings, and (2) in not suppressing statements allegedly made by Mr. Singh. Because of these errors, the government has failed to demonstrate by the requisite level of proof that Mr. Singh violated 8 U.S.C. § 1182(a)(6)(E)(i). Therefore, we vacate and remand for further proceedings.

Anne E. Doebler, Buffalo, New York, for Petitioner.
Paul M. O'Brien, United States Attorney, Middle District of Tennessee (Brent A. Hannafan, Assistant United States Attorney, Nashville, Tennessee) for Respondents.

PAUL J. KELLY, JR., Circuit Judge.

Petitioner Lakhwinder Singh petitions for review of a BIA final order affirming the decision of an IJ in Buffalo, New York, which ordered Mr. Singh removed and deported from the United States as an "alien who . . . knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law" under 8 U.S.C. § 1182(a)(6)(E)(i). By oral decision entered on March 25, 2003, the IJ held that Mr. Singh was removable as an "alien smuggler," J.A. 35, and the BIA affirmed without opinion

on June 3, 2004, J.A. 2. Having exhausted his administrative remedies, Mr. Singh now appeals. Our jurisdiction arises under 8 U.S.C. § 1252(b)(2).

## Background

Mr. Singh is an Indian citizen and a permanent resident of the United States, residing in upstate New York. J.A. 63, 73-74, 91, 251. He arrived in the United States in 1999 and is married to a United States citizen. J.A. 74-75. Mr. Singh and his wife have two young children, and he has been employed in the engineering department of a communications company since 1999. J.A. 75-76.

In January 2001, Mr. Singh and his family lived in a duplex home in Buffalo, New York, upstairs from Mr. Sukhpreet Singh Bedi, whom Mr. Singh had met approximately two to three months prior to the events at issue. J.A. 77-79. They were friendly, but not overly familiar with one another. J.A. 79-82, 94-95. Mr. Singh testified that he did not "know if [Mr.] Bedi was working but maybe he had [said] that he was working at some gas station." J.A. 83.

On January 28, 2001, Mr. Singh and Mr. Bedi traveled to a strip club in St. Catharine's in Ontario, Canada, and spent several hours there. J.A. 86, 90, 97, 105, 108. Mr. Singh had been to this particular club, and no other, several times before; however, it was Mr. Bedi's first time to such an establishment. J.A. 88-89, 101, 109. Before their trip, Mr. Singh confirmed that Mr. Bedi had his

-3-

Canadian passport with him because Mr. Singh's aunt, a translator for United States immigration authorities, had warned him about the trouble that could arise for permanent residents traveling across the border with improperly documented passengers. J.A. 91-92, 94, 141. Mr. Singh testified that he believed a Canadian passport was sufficient for the trip and did not realize that Mr. Bedi required any additional documentation. J.A. 93-94. Mr. Singh further testified that Mr. Bedi had traveled back and forth between Canada and Buffalo on a few occasions, without any immigration problems. J.A. 152. On their way home from the club, Mr. Singh suggested that they tell immigration authorities they were actually coming from Hamilton, Ontario, in order to save Mr. Singh any embarrassment. J.A. 108-10, 113, 161-62. Mr. Singh's wife was not aware that he had been visiting a strip club that night, J.A. 86, and Mr. Bedi was agreeable to the story, J.A. 110.

At the Lewiston Bridge border inspection station at approximately 1:30 a.m., Mr. Singh informed the primary inspecting officer, Kenneth Patten, that they were en route from Hamilton. J.A. 116-18, 151-52, 193-95. Mr. Singh and Mr. Bedi were then told to park the car and come into the station, where they were separated. J.A. 119. Mr. Singh testified that, after waiting over an hour, J.A. 119, Officer Patten called him into a small room for an interrogation, which lasted more than four hours. J.A. 124, 145-47, 197-99, 207. He stated that he was

repeatedly threatened with jail, and was told that he could go home if he agreed with the statements Officer Patten presented to him. J.A. 123-24, 129, 147-49, 154-57, 159, 162-63.

Mr. Singh testified that he did not feel as if he was free to leave while waiting or during the interrogation, not only because there were "officers everywhere," but also because immigration agents were holding his car, driver's license, and permanent resident card. J.A. 122, 143-45. Officer Patten confirmed that Mr. Singh was not free to leave once he was referred to the secondary inspection station. J.A. 212. Moreover, during the interview Mr. Singh broke down crying and eventually began "rambling on." J.A. 188-89, 202-03, 210.

Mr. Singh claims that, at the outset, he was not informed of his right to speak with an attorney before giving his statement, that he was going to be put into removal proceedings, or that he would eventually need to appear before a judge. J.A. 150, 189-90, 211. He was merely told that he would need to sign various documents before he would be permitted to leave. J.A. 150. Mr. Singh signed many documents that morning, and an officer other than Officer Patten witnessed his signature on these documents. J.A. 155. Among them was a three-page, double-spaced "statement," which he insists (1) he "never read," (2) was obtained involuntarily, (3) did not include any explanation of his rights unlike the form Mr. Bedi signed, (4) indicated it was being taken "[I]n the case of:

Sukhpreet Singh BEDI," and (5) did not reflect the actual statements he made to the interrogating officer. J.A. 128, 129, 131-36, 181, 186-87, 239 (Mr. Singh's statement), 244 (Mr. Bedi's statement). In fact, Officer Marianna Zavala, the witnessing officer, testified that her signature on the statement meant that she witnessed the interrogation Officer Patten conducted, but in reality she only witnessed "bits and pieces" of the interview and she did not recall seeing Mr. Singh actually sign the statement. J.A. 167-68, 170, 177-78, 190-91.

In relevant part, the statement reads as follows:

Q: Who are you traveling with today?
A: Sukhpreet Singh BEDI.

Q: What is your relationship with Mr. BEDI?
A: A friend, but he calls me like a brother.

Q: Why are your [sic] traveling with Mr. BEDI today?
A: We went to a strip club in St. Catherines today.

Q: Where did you pick Mr. BEDI up at?
A: From downstairs at my house.

Q: When I spoke to you outside, where did you tell me that you picked Mr. BEDI up at?
A: I told you Hamilton, sir.

Q: Why did you tell me you picked Mr. BEDI up in Hamilton?
A: Because he (Mr. BEDI) told me to say we were coming from Hamilton.

Q: Why did Mr. BEDI tell you to say you were coming from Hamilton?
A: Because if we told the truth, you would not allow him to enter.

Q: Does Mr. BEDI live with you?
A: No.

Q: Where does Mr. BEDI live?
A: As far as I know, he is staying with his cousin in the flat below me.

Q: When I spoke to you outside, and then inside, where did you tell me Mr. BEDI lived?
A: Hamilton, but I have never gone there.

Q: How long has Mr. BEDI lived in the apartment below you?
A: I don't know exactly, about two or three months.

Q: Have you ever picked Mr. BEDI up at work?
A: No.

Q: Where does Mr. BEDI work?
A: He told me at a gas station in Niagara Falls, New York.

Q: What is the name of the gas station Mr. BEDI is employed at?
A: A Getty gas station.

Q: Who is the owner of that Getty gas station that employs Mr. BEDI?
A: Bobby that's all I know.

Q: How long has he worked there?
A: I don't know.

Q: What did you tell me earlier, when I asked you, where does Mr. BEDI work?
A: I told [you] he doesn't work.

Q: Why did [you] tell me that he does not work?
A: I was afraid that they are not going to let him (Mr. BEDI) enter.

Q: When I asked Mr. BEDI outside, if he had ever lived, worked or gone to school in the U.S., he said no. Why didn't you say anything about his working at the Getty gas station or his living in the

apartment below you at that time?
A: Because I was afraid you wouldn't allow him in the U.S. and you would send him back to Hamilton.

Q: As far as you know, does Mr. BIDI [sic] have permission from the U.S. government to live or work in the U.S.?
A: No, he doesn't have any permission.

Q: Did you know your Mr. BEDI needed a permit to work in the U.S.?
A: Yes.

Q: Did you know it was a violation of the law to work in the U.S. without permission of the U.S. government?
A: Yes.

J.A. 240-41.

Eventually, that morning sometime before 8 a.m., Officer Patten served Mr. Singh with a Notice to Appear, which rendered him the "arresting officer," according to the IJ. J.A. 215. At that point, Mr. Singh had been in the immigration offices from approximately 1:30 a.m. the night before until 7 a.m. that morning, and had not had any sleep since approximately 7:30 a.m. the previous morning. J.A. 143, 194. While Mr. Singh briefly saw Mr. Bedi on the morning of his release from the immigration offices, when Mr. Singh's wife arrived, he has not seen Mr. Bedi since. J.A. 120-21. Mr. Bedi was immediately deported to Canada that morning. J.A. 174.

On this petition for review of the IJ's oral decision ordering Mr. Singh's removal and the BIA's affirmance, Mr. Singh argues that the IJ erred (1) in

making unsupported credibility findings, and (2) in not suppressing Mr. Singh's statement.[1] Therefore, he claims the government failed to establish by "clear, convincing and unequivocal evidence" that he violated 8 U.S.C. § 1182(a)(6)(E)(i).

## Discussion

Where the BIA affirms the decision of the IJ without opinion, we review the IJ's decision directly as the final agency determination. Ci Pan v. U.S. Att'y Gen., 449 F.3d 408, 410 (2d Cir. 2006) (citing Ming Xia Chen v. BIA, 435 F.3d 141, 144 (2d Cir. 2006)). We review factual findings, including adverse credibility determinations, for substantial evidence, "overturning them only if any reasonable adjudicator would be compelled to conclude to the contrary." Id. at

---

[1] Mr. Singh further argues that the IJ erred in failing to suppress statements allegedly made by a witness not produced at the hearing, which Mr. Singh claims deprived him of the right to confront an adverse witness. We note that, in exploring this issue in similar cases, our sister circuits in the First, Fifth, and Ninth Circuits have agreed that the government violates principles of fundamental fairness when it submits an affidavit without first attempting to secure the presence of those potential witnesses for cross-examination. See Hernandez-Guadarrama v. Ashcroft, 394 F.3d 674, 681-82 (9th Cir. 2005); Ocasio v. Ashcroft, 375 F.3d 105, 107 (1st Cir. 2004); Olabanji v. INS, 973 F.2d 1232, 1234-35 (5th Cir. 1992); cf. Dallo v. INS, 765 F.2d 581, 586 (6th Cir. 1985) (noting this principle without disapproval). However, because the admission of these statements constitutes harmless error in the instant case, we need not reach the issue of whether the government should have made a reasonable effort to secure the witness's presence for cross-examination by Mr. Singh.

410-11; see 8 U.S.C. § 1252(b)(4)(B); Chambers v. Office of Chief Counsel, 494 F.3d 274, 277-78 (2d Cir. 2007); see also Biao Yang v. Gonzales, 496 F.3d 268, 271-72 (2d Cir. 2007); Shi v. BIA, 374 F.3d 64, 65 (2d Cir. 2004). Therefore, "[s]uch findings must be upheld if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." Diallo v. INS, 232 F.3d 279, 287 (2d Cir. 2000) (internal quotation marks and citation omitted). While this standard of review poses a substantial hurdle to overturn credibility findings, it is not insurmountable, and in this case, because the government failed to proffer clear and convincing evidence that Mr. Singh knowingly assisted Mr. Bedi in entering the United States in violation of law, we vacate and remand.

I.     The IJ's Credibility Findings

We turn first to Mr. Singh's arguments that the IJ erred in (1) rejecting Mr. Singh's testimony and crediting Officer Patten's testimony, and (2) taking judicial notice of the fact that it is common knowledge that there are strip clubs in Buffalo, New York.

Ordinarily, courts treat questions of credibility in deportation proceedings "as questions of fact subject to the substantial evidence standard." Secaida-Rosales v. INS, 331 F.3d 297, 307 (2d Cir. 2003), abrogated on other grounds as recognized in Xiu Xia Lin v. Mukasey, 534 F.3d 162 (2d Cir. 2008). As such, we generally defer to an IJ's credibility determination, but "[w]e may . . . vacate and

-10-

remand an adverse credibility determination if we find that the [IJ] has failed to 'act fairly in judging credibility and in assessing the sufficiency of the evidence.'" Biao Yang, 496 F.3d at 271-72 (quoting Cao He Lin v. U.S. Dep't of Justice, 428 F.3d 391, 394 (2d Cir. 2005)). In assessing an adverse credibility determination, further inquiry into the IJ's reasoning may be necessary. Secaida-Rosales, 331 F.3d at 307 (citing Aguilera-Cota v. INS, 914 F.2d 1375, 1381 (9th Cir. 1990)). Even if there are errors, if we can predict with confidence that "'there is no realistic possibility that, absent the errors, the IJ or BIA would have reached a different conclusion,'" we will affirm the IJ's credibility determination. Biao Yang, 496 F.3d at 272 (quoting Cao He Lin, 428 F.3d at 401). Otherwise, an adverse credibility determination cannot stand where it is based on speculation or conjecture, an incorrect analysis of the testimony, or flawed reasoning, rather than on evidence in the record. Secaida-Rosales, 331 F.3d at 307; see also Cao He Lin, 428 F.3d at 400-01. We have also expressed skepticism when adverse credibility determinations are couched in "boiler-plate language." Cao He Lin, 428 F.3d at 402.

In determining that Mr. Singh did not enjoy the "same level of credibility" as the immigration officers, the IJ relied on general comments about Mr. Singh's demeanor, relying on "the Court's observation of him, the way he handled the questions, the way he could not look the Court in the [eye] when giving that

testimony, his body language, and other factors." J.A. 49. Beyond these general comments, the IJ articulated three specific reasons for rejecting Mr. Singh's credibility: (1) that contrary to Mr. Singh's assertions, he was informed of his right to counsel before he was interviewed and signed the affidavit, J.A. 48; (2) that Mr. Singh testified he did not know of any adult clubs in New York, J.A. 49; and (3) that Mr. Singh admitted to lying to a customs official about his activities in Canada, J.A. 45, 47. In essence, the IJ did "not find any credible evidence of egregious conduct on the part of the arresting officers or the investigating officers," J.A. 45, 48, and gave great weight to the routine processing procedures to which the immigration officers testified, despite their lack of memory as to the events in question. J.A. 48, 50, 180-81, 187, 210-12. When carefully analyzed against the record evidence, these grounds do not provide an adequate basis for discrediting Mr. Singh's testimony.

The IJ's central reason for discrediting Mr. Singh's testimony – that Officer Patten advised Mr. Singh of his rights before taking the statement – is based on a factual premise not supported by the record. Compare J.A. 45, 49, with J.A. 180-81, 189-90, 211. The IJ found that Officer Patten "gave [Mr. Singh] his rights before" interviewing him. J.A. 45; 49 (stating that Officer Patten "told the respondent that what he said in the statement would or possibly could be used against him or, put another way, could be used in court, and gave him his rights

-12-

before doing so"). The record is otherwise. Officer Zavala testified that she herself did not advise Mr. Singh of his right to be represented by counsel. J.A. 180-81. She further testified that Mr. Singh was advised of his rights only "towards the end of the interview," after several hours had gone by. J.A. 189-90. And Officer Patten, who actually interviewed Mr. Singh, specifically testified that he advised Mr. Singh of his right to an attorney *after* he took Mr. Singh's statement. J.A. 211. Moreover, as discussed below, Mr. Singh's I-877 form, upon which his statement was taken, did not warn that the statements could be used against him. J.A. 239. Not only does this failure to advise Mr. Singh of his rights undermine the reliability of the underlying affidavit, it also undermines the IJ's adverse credibility determination. See J.A. 45, 48, 49, 51.

The IJ's second stated reason for discrediting Mr. Singh's testimony – that Mr. Singh in fact knew of adult clubs in New York and therefore went to Canada not to visit a club but to smuggle Mr. Bedi – is simply illogical. Assuming the IJ properly took administrative notice of the existence of adult strip clubs in Buffalo,[2] he engaged in a dubious analytical process to discredit Mr. Singh's

---

[2] The Federal Rules of Evidence do not apply in removal proceedings, and evidence will be admitted provided it "'does not violate the alien's right to due process of law.'" Aslam v. Mukasey, 537 F.3d 110, 114 (2d Cir. 2008) (quoting Zhen Nan Lin v. U.S. Dep't of Justice, 459 F.3d 255, 268 (2d Cir. 2006)). Here, Mr. Singh argues that the IJ erred in taking notice of the fact that there are strip clubs in Buffalo, in declaring that such knowledge is "common," and then in

(continued...)

-13-

testimony. The IJ concluded that Mr. Singh must have known about such clubs in New York, and therefore reasoned that Mr. Singh "was not traveling to Canada to go to a strip club . . . [but] perhaps maybe even to smuggle the smuglee into the United States." J.A. 49. Even assuming that the IJ was correct, and Mr. Singh knew of strip clubs in Buffalo and wanted to ensure Mr. Bedi's continued unlawful presence in the United States, then Mr. Singh and Mr. Bedi had to do no more than visit such an establishment on the American side of the border. Why Mr. Singh chose to visit a Canadian club is beyond the focus of our inquiry (anonymity does come to mind); however, the fact remains that Mr. Singh and Mr. Bedi drove to Canada from the United States and then attempted to reenter the United States later that evening. Surely, were Mr. Bedi's continued presence in Buffalo Mr. Singh's aim, Mr. Singh would have recognized that leaving the United States would frustrate that purpose.

The third stated reason for discrediting Mr. Singh's testimony is equally

---

[2](...continued)
inferring that Mr. Singh must be lying about his purpose in visiting Canada with Mr. Bedi. J.A. 49-50. This court has held that judges are not required to be "ignorant" in court of what is common knowledge, Kaggen v. IRS, 71 F.3d 1018, 1020 (2d Cir. 1995); however, in taking notice of potentially controlling facts, an IJ can exceed his discretion when he fails to provide an opportunity to rebut such facts. See Chhetry v. U.S. Dep't of Justice, 490 F.3d 196, 200 (2d Cir. 2007). But, because of our resolution, the judicially noticed facts here are not crucial, and we need not decide whether Mr. Singh's deprivation of an opportunity to rebut constituted a violation of his Fifth Amendment due process rights.

-14-

problematic. The IJ concluded that Mr. Singh's testimony was unreliable because he admitted to misrepresenting his destination in Canada to the customs official so as to avoid disclosing his presence at a strip club. J.A. 45, 49-50. However, Mr. Singh's misrepresentation is immaterial and unrelated to any legitimate immigration concern. Certainly, this misrepresentation is far from sufficient to justify discrediting Mr. Singh's testimony about issues of fundamental importance.

For these reasons we conclude, under the totality of the circumstances, that the IJ's adverse credibility determination was improper.

II.    Suppression of Mr. Singh's Statement

Mr. Singh also argues that his signed statement dated January 28, 2001, should have been excluded from his deportation proceedings because it was obtained "involuntarily and in violation of the applicable federal regulations."

It is well established that the Fifth Amendment affords aliens due process of law during deportation proceedings. See Felzcerek v. INS, 75 F.3d 112, 115 (2d Cir. 1996) (citing Reno v. Flores, 507 U.S. 292, 305-07 (1993)); see also Bridges v. Wilson, 326 U.S. 135, 154 (1945). While the Supreme Court held in INS v. Lopez-Mendoza that the exclusionary rule generally does not apply in deportation proceedings, the Court did not address exclusion with regard to "egregious violations of Fourth Amendment or other liberties that might

-15-

transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." 468 U.S. 1032, 1050-51 (1984). In interpreting the Supreme Court's decision, this court has held that exclusion of evidence is appropriate "'if record evidence established either (a) that an egregious violation that was fundamentally unfair had occurred, or (b) that the violation – regardless of its egregiousness or unfairness – undermined the reliability of the evidence in dispute.'" Pinto-Montoya v. Mukasey, 540 F.3d 126, 131 (2d Cir. 2008) (quoting Almeida-Amaral v. Gonzales, 461 F.3d 231, 235 (2d Cir. 2006)). Even assuming that the conduct here was not "egregious," it nonetheless "undermined the reliability of the evidence in dispute." Almeida-Amaral, 461 F.3d at 235.

Mr. Singh's statement should have been suppressed because it was unreliable. First, the conditions of the interrogation itself undermine the statement. During the interrogation, Mr. Singh was held by immigration officers for at least four to five hours, in a place where armed, uniformed officers were circulating. J.A. 147-49. Mr. Singh further reports that Officer Patten was pressuring him, telling him repeatedly that he would be sent to jail.[3] J.A. 148-49, 123, 154, 162-63. As a result, both Officers Patten and Zavala confirmed that Mr.

---

[3] The "use of threats, coercion, or physical abuse by the designated immigration officer to induce a suspect to waive his or her rights or to make a statement is prohibited." 8 C.F.R. § 287.8(c)(vii); see also Pinto-Montoya, 540 F.3d at 129-30.

-16-

Singh broke down crying during the interrogation, which took place during the wee hours of the morning. J.A. 143, 188, 210. Mr. Singh had not slept for approximately twenty-four hours by the time he was released. J.A. 143. In addition, Mr. Singh testified that he "never read" the statement he was asked to sign, and that it contained admissions he never made. J.A. 125-26, 128-29, 132-33, 155, 162-63. Most important, Mr. Singh testified that he had no idea whether Mr. Bedi had permission to work and live in the United States, rather that the interrogating officer "kept on asking me this again and again . . . . He wanted to hear what he wanted to hear." J.A. 136. In fact, Officer Patten stated, "On a regular basis I interview people, and quite often they will not give me the answer that I am asking for. And in turn I'll just have to try a different approach to get it." J.A. 212.

Second, Mr. Singh was undeniably in custody at the time he made his statements. The interrogating officer took control of Mr. Singh's car and his permanent resident card, thus rendering it impossible for him to walk away at any point during the course of the night.[4] J.A. 143-44, 212. Third, as discussed

---

[4] Under 8 C.F.R. § 287.8(b)(2), officials have the power only to "*briefly* detain [a suspect] for questioning" if they have "reasonable suspicion, based on specific articulable facts, that the person being questioned is . . . engaged in an offense against the United States" (emphasis added). During questioning, such officials may not "restrain the freedom of an individual, not under arrest, to walk away." Id. § 287.8(b)(1).

above, it is unclear when, if ever, Mr. Singh was informed of his right to speak with an attorney, that his statements could be used against him, or that he was in danger of removal himself.  J.A. 150, 210-11; see 8 C.F.R. § 287.3(c) (requiring the examining officer to inform an alien of his rights); see also J.A. 239 (Mr. Singh's statement).  The failure to warn Mr. Singh of the consequences of his statements is evidenced by the very form on which it was taken.  Mr. Bedi's form I-867A includes the warning that "[a]ny statement you make may be used against you in this or any subsequent administrative proceeding," but Mr. Singh's I-877 form merely indicates that his statement was to be used "in the case of" Mr. Bedi and includes no indication that Mr. Singh was even under suspicion of having committed a crime or that his statements could be used against him.  See J.A. 239, 244.  Fourth, Officer Zavala admitted that, although she witnessed Mr. Singh's signature on the statement, she heard only "bits and pieces of the interview," J.A. 168, 177-78; that she didn't recall whether she saw Mr. Singh sign the statement, J.A. 170; and that she could not specifically remember anyone informing Mr. Singh of his rights, at least not until after a "few hours had already gone by," J.A. 181, 189-90.

Finally, Mr. Singh urges that the government violated 8 C.F.R. § 287.3(a) when the same officer interrogated and arrested him.  The C.F.R. provides that

> [a]n alien arrested without a warrant of arrest . . . will be examined
> by an officer other than the arresting officer.  If no other qualified

-18-

officer is readily available . . . the arresting officer, if the conduct of such examination is a part of the duties assigned to him or her, may examine the alien.

8 C.F.R. § 287.3(a). The IJ determined that Officer Patten was the "arresting officer" in this case. J.A. 215-16. The record does not show that no other qualified officer was available to examine Mr. Singh.

In those immigration cases where we have affirmed the denial of suppression motions on the basis that the evidence was nonetheless reliable, the evidence related to simple, specific, and objective facts, e.g., whether a person is a foreign citizen or has a passport and valid visa. See, e.g., Melnitsenko v. Mukasey, 517 F.3d 42, 44-45 (2d Cir. 2008); Almeida-Amaral, 461 F.3d at 233; see also Lopez-Mendoza, 468 U.S. at 1035; Rajah v. Mukasey, 544 F.3d 427, 440-41 (2d Cir. 2008); Pinto-Montoya, 540 F.3d at 128. These facts are not altered by coercive interrogation – a person either is or is not a citizen of a particular country and either does or does not have a visa. In this case, the underlying issue – whether Mr. Singh knew that Mr. Bedi, although a Canadian citizen with permission to enter the United States, was entering the country in violation of law by virtue of his intent to continue working in the United States without authorization – is more nuanced and susceptible to corruption during the course of an improper interview. Since signing the statement, Mr. Singh has consistently denied that he knew Mr. Bedi was entering the United States in violation of law.

Mr. Singh's argument (that the information is untrue and should be suppressed) is both logical and more plausible than the argument asserted by the petitioners in the above cases (that the information is true but should be suppressed anyway).

Given the procedures employed in this case, the reliability of Mr. Singh's statement is substantially undermined; the statement should have been suppressed.

III. Conclusion

The BIA requires clear and convincing evidence to make a deportation determination. See 8 U.S.C. § 1229a(c)(3)(A); Woodby v. INS, 385 U.S. 276, 285-86 (1966); Zerrei v. Gonzales, 471 F.3d 342, 345 (2d Cir. 2006). In making this deportation determination, the IJ relied on unsupported credibility determinations and on Mr. Singh's unreliable statement. Because we find, in this extraordinary case, that the government has failed to demonstrate by the requisite level of proof that Mr. Singh violated 8 U.S.C. § 1182(a)(6)(E)(i), we GRANT the petition for review, VACATE the BIA's final order removing Mr. Singh from the United States, and REMAND to the BIA for further proceedings.