*Zuniga-Perez v. Sessions*

BIA
Hochul, IJ
A 201 218 867/868

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2017

(Argued: May 16, 2018      Decided: July 25, 2018)

Docket No. 17-996

———————————————

JUAN MARTIN ZUNIGA-PEREZ AND ELDER HERNANDEZ-OCAMPO,
AKA Fabian Ruia-Abarca, AKA Jose Hernandez,

*Petitioners*,

*v.*

JEFFERSON B. SESSIONS III, United States Attorney General,

*Respondent.*\*

———————————————

ON PETITION FOR REVIEW FROM THE
BOARD OF IMMIGRATION APPEALS

———————————————

Before:

POOLER, WESLEY, and CHIN, *Circuit Judges*.

———————————————

———————————————

\*      The Clerk of Court is respectfully directed to amend the caption to conform to
the above.

Petition for review of a decision of the Board of Immigration

Appeals affirming the immigration judge's denial -- without a hearing -- of

petitioners' motions to suppress evidence relating to their immigration status

obtained by law enforcement agents during a nighttime search of their residence.

Petitioners contend that, based on their affidavits submitted to the immigration

judge, they were entitled to a suppression hearing. We grant the petition for

review and remand this matter to the Board of Immigration Appeals for further

proceedings.

Petition GRANTED and case REMANDED.

---

ANNE E. DOEBLER, Buffalo, New York, *for Petitioners*.

MICHAEL C. HEYSE, Trial Attorney (Mary Jane Candaux, Assistant Director, *on the brief*), Office of Immigration Litigation, *for* Chad A. Readler, Acting Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, District of Columbia, *for Respondent*.

---

CHIN, *Circuit Judge*:

Petitioners Juan Martin Zuniga-Perez and Elder Hernandez-Ocampo seek review of a March 10, 2017, decision of the Board of Immigration Appeals (the "BIA") affirming a February 24, 2016, decision of an immigration judge (the "IJ") denying -- without a hearing -- their motion to suppress evidence. *In re Zuniga-Perez, Hernandez-Ocampo*, Nos. A 201 218 867/868 (B.I.A. Mar. 10, 2017), *aff'g* Nos. A 201 218 867/868 (Immig. Ct. Buffalo Feb. 24, 2016). Petitioners, citizens of Mexico residing in upstate New York, were arrested during a search of their residence by law enforcement officers purportedly looking for a criminal suspect pursuant to a "felony search warrant."

In removal proceedings before the IJ, both petitioners moved to suppress the evidence obtained during the search, arguing that the search violated the Fourth Amendment because it was conducted without a warrant, consent, or exigent circumstances, and, even assuming the existence of a warrant, the search exceeded its scope. Although petitioners submitted affidavits in support of their motion, the IJ denied the motion, without holding a suppression hearing. The question presented is whether the IJ should have held an evidentiary hearing in light of the evidence submitted by petitioners. We hold

that because petitioners made a sufficient showing of an egregious constitutional violation, they were entitled to a suppression hearing.

## STATEMENT OF THE CASE

**A.     *The Search***

The facts are drawn from the Form I-213s submitted by the Department of Homeland Security ("DHS") to initiate the removal proceedings and petitioners' affidavits in support of their motions to suppress.[1]

At 10:00 pm on September 4, 2011, New York State Police gained entry to petitioners' residence in Galen, New York, purportedly to execute a "felony search warrant."  App. 135, 206.  The police entered the house while petitioners were asleep.  Many other police surrounded the house.  Petitioners

---

[1]     A Form I-213 is an "official record" prepared by immigration officials when initially processing a person suspected of being in the United States without lawful permission.  *See, e.g., Maldonado v. Holder,* 763 F.3d 155, 158 n.1 (2d Cir. 2014) (quoting *Bauge v. INS*, 7 F.3d 1540, 1543 n.2 (10th Cir. 1993)).  A Form I-213 is a public record "made by public officials in the ordinary course of their duties, and accordingly evidence[s] strong indicia of reliability."  *Felzcerek v. INS*, 75 F.3d 112, 116 (2d Cir. 1996).  A Form I-213 is considered "presumptively reliable" and admissible even absent the testimony of the officer who prepared it, unless "the reliability of the form is somehow undermined."  *Id.* at 117; *see also In re Ponce-Hernandez*, 22 I. & N. Dec. 784, 785 (B.I.A. 1999) ("[A]bsent any evidence that a Form I-213 contains information that is incorrect or was obtained by coercion or duress, that document is inherently trustworthy and admissible as evidence to prove alienage or deportability.").

"shared a rented room" in the house and were awakened by the police knocking on the window and shining a flashlight into their room, "shouting, 'open the window.  Open the door.'"  App. 126 ¶ 1, 4; 196 ¶ 1, 4.  Petitioners did not open the door, nor did they give permission to the police to enter.  Petitioners learned later that another resident of the house, who lived in a different room, let the police in because, as he explained, "the police gave him no choice."  App. 126 ¶ 3, 196 ¶ 3.

> The Form I-213s provide the following explanation for the search:
>
> Troopers . . . were executing a felony search warrant located at [the house].  Information received by NYSP stated that a possible fugitive from justice was located at this address and *in addition there were known Hispanic migrants* residing at the residence.

App. 135, 206 (emphasis added).  The police were accompanied by two members of the United States Customs and Border Patrol who were allegedly brought along to provide "translation assistance."  App. 135, 206.  According to petitioners' affidavits, petitioners "stayed in [their] room as the police entered the house, until [the police] came to [their] room."  App. 126 ¶ 4, 196 ¶ 4.  The police then "rounded up everyone in the house and took [them] to the living room."  App. 126 ¶ 5, 196 ¶ 5.  They asked if petitioners knew the fugitive.  Petitioners

-5-

stated that they "knew him but that he was not there" though he "used to live in the same room as [petitioners]." App. 126 ¶ 6, 196 ¶ 6.

One of the Border Patrol officers then asked petitioners if they "had papers to be in the United States." App. 126 ¶ 7, 196 ¶ 7. Three of the residents (including petitioners) stated that they were citizens of Mexico and did not possess valid immigration documentation. Border Patrol agents then arrested those three residents for violating Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(A)(i).[2] Border Patrol agents allowed Hernandez-Ocampo to get dressed. As he did so, two officers with rifles "guarded" him. App. 196 ¶ 7. Zuniga-Perez was taken into custody without an opportunity to change, although he was in shorts. They then handcuffed petitioners. The Border Patrol asked about petitioners' immigration status only *after* the police determined that the fugitive was not present.

**B.** *The Proceeding Before the IJp*

On September 5, 2011, DHS issued a Notice to Appear to both petitioners charging them with being removable pursuant to INA

---

[2]     8 U.S.C. § 1182(a)(6)(A)(i) provides that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."

-6-

§ 212(a)(6)(A)(i). Although they initially appeared *pro se*, they eventually obtained counsel. On November 20, 2015, with the assistance of counsel, petitioners moved to suppress the two Form I-213s and all evidence from the September 2011 raid and arrests. Petitioners argued that the Border Patrol agents had no articulable suspicion to believe that petitioners had violated the law and that they conducted the search without a warrant, consent, or exigent circumstances. Petitioners also alleged that the Border Patrol agents used the access obtained by the police as a pretext to search their residence, and that the search was conducted in violation of agency regulations requiring reasonable suspicion before stopping and seizing individuals. Finally, petitioners argued that the search was racially motivated because the police conducted the search because they believed there were "known Hispanic migrants" at the residence. Pet'rs' Mot. to Suppress at 4-5, *In re Zuniga-Perez*, No. A 201 218 867 (Immig. Ct. Buffalo Nov. 20, 2015). Petitioners requested an evidentiary hearing in the event the IJ did not grant their motion on the papers.

The IJ held a conference on December 7, 2015. Counsel for petitioners raised the issue of the lack of a search warrant in the record, noting, "I don't have the search warrant. I don't know if there was literally a search

warrant or if it was an arrest warrant or what the state trooper[s] had." App. 67.

Counsel also voiced her concerns about the use of Border Patrol officers as interpreters:

> [M]y concern is how the state police and the Border Patrol interact. So, the state police have independent interpreters that they called telephonically when they need interpreters for cases. And in this particular case, they called the [B]order [Patrol] to come act as translators. But the Border Patrol don't work for the New York State Police as translators. So, my argument, your honor, is that that is a pre-textu[]al way that they're inviting the Border Patrol along because they believe that they're going to gain access to a location. But there's no reasonable suspicion for that access, your honor.

App. 67-68. Counsel also argued that "simply because someone might be a migrant Hispanic farm worker doesn't necessarily mean that they lack status." App. 69.[3]

The IJ asked several questions of petitioners' counsel and DHS counsel, but no witnesses testified and no evidence was presented. DHS had not yet responded to the suppression motion, and the matter was adjourned to give it an opportunity to do so. DHS submitted a written response on December 22, 2015.

---

[3]      In fact, one of the seven individuals interrogated by the agents was a U.S. citizen.

## C.    *The IJ Decision*

On February 24, 2016, without any further proceedings, the IJ denied petitioners' motion to suppress in a written decision.  The IJ found that the evidence was not obtained

> in violation of any provision of the U.S. Constitution or any law or regulation of the United States.  Further, no agency violations occurred that would warrant suppression of any resulting evidence.  Further still, the instant motion is not supported by *any* evidence and does not support a *prima facie* showing to suppress evidence.

App. 87.  The IJ did not address petitioners' request for an evidentiary hearing.

At a hearing on March 16, 2016, the IJ found petitioners removable and inadmissible pursuant to INA § 212(a)(6)(A)(i).

## D.    *The Appeal to the BIA*

Petitioners appealed the IJ's decision to the BIA.  On March 10, 2017, the BIA affirmed the IJ's decision.  *In re Zuniga-Perez, Hernandez-Ocampo*, Nos. A 201 218 867/868 (B.I.A. Mar. 10, 2017).  The BIA concluded:

> We affirm the Immigration Judge's decision denying the respondents' motion to suppress evidence and ordering them removed.  We discern no error in the Immigration Judge's finding that the search warrant executed by the New York State Police was not conducted in a way that resulted in an egregious violation of the respondents' Fourth Amendment

rights. As the Immigration Judge found, the respondents' affidavits do not allege, and there is no evidence to support a claim, that law enforcement officials took any action that was racially motivated or was taken because the respondents are Hispanic in appearance or are migrant farm workers. We are unable to find evidence that the CBP officials engaged in an egregious violation of the Fourth Amendment such that the manner in which the respondents were questioned would be considered fundamentally unfair. There is no evidence that physical force was used or that the respondents were threatened or mistreated in any way. The respondents offer no compelling basis for departing from the general principle that the exclusionary rule does not apply to removal proceedings.

Although the respondents argue that an evidentiary hearing should be held, a hearing is unnecessary because, even accepting the respondents' affidavits as true, the actions of the government were not "egregious," and thus their claim does not set forth a prima facie case for suppression.

App. 4 (citations omitted). This petition for review followed.

### DISCUSSION

This Court reviews the agency's factual findings for substantial evidence, *see* 8 U.S.C. § 1252(b)(4)(B), and legal conclusions *de novo*. *See Almeida-Amaral v. Gonzales*, 461 F.3d 231, 233-34 (2d Cir. 2006). Generally, credibility questions in deportation proceedings are treated as questions of fact subject to the substantial evidence standard. *See Gao v. Sessions*, 891 F.3d 67, 76 (2d Cir.

-10-

2018); *Singh v. Mukasey*, 553 F.3d 207, 212-13 (2d Cir. 2009). "Credibility determinations that are based on the IJ's analysis of testimony, as opposed to demeanor, are granted less deference." *Gao v. Bd. of Immigration Appeals*, 482 F.3d 122, 127 (2d Cir. 2007). And where the question is whether a petitioner is entitled to an evidentiary hearing, the agency must accept the allegations in the proffered affidavits as true. *See Maldonado v. Holder*, 763 F.3d 155, 160-62 (2d Cir. 2014).

### A.    *Applicable Law*

#### 1.    *General Constitutional Principles*

The Constitution protects both citizens and non-citizens. Under the Fifth Amendment, an alien is entitled to due process of law in deportation proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993); *Singh*, 553 F.3d at 214 ("It is well established that the Fifth Amendment affords aliens due process of law during deportation proceedings."); *Felzcerek v. INS*, 75 F.3d 112, 115 (2d Cir. 1996) (same). Specifically, "the Fifth Amendment protects aliens in deportation proceedings from procedures that transgress the fundamental notions of 'fair play' that animate the Fifth Amendment." *Rajah v. Mukasey*, 544 F.3d 427, 441 (2d Cir. 2008) (quoting *Montilla v. INS*, 926 F.2d 162, 164 (2d Cir. 1991)). Fourth Amendment protections also extend to non-citizens. *See INS v. Lopez-Mendoza*,

468 U.S. 1032, 1046 (1984) (noting that it is "[i]mportant . . . to protect the Fourth Amendment rights of all persons"); *Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013) ("[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike.").

Several Fourth and Fifth Amendment principles are implicated in this case. First, "in the absence of consent or exigent circumstances . . . [the Court has] consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." *Cotzojay*, 725 F.3d at 181 (quoting *Steagald v. United States*, 451 U.S. 204, 211 (1981)). The Fourth Amendment reaches its "zenith in the home," because at its core the Amendment safeguards "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Id.* (quoting *Payton v. New York*, 445 U.S. 573, 589-90 (1980)).

Second, even where a warrant has been issued, law enforcement agents are bound by its terms: "because a warrant generally authorizes no more than what it expressly provides, to act unreasonably beyond the terms of a warrant is akin to acting without a warrant at all." *Simon v. City of N.Y.*, 893 F.3d 83, 94 (2d Cir. 2018). Search and arrest warrants impose different limitations.

-12-

For search warrants, "[w]e look directly to the text of the search warrant to determine the permissible scope of an authorized search." *United States v. Bershchansky*, 788 F.3d 102, 111 (2d Cir. 2015). The warrant must "describe with particularity the place to be searched and the items to be seized" -- a requirement that "protects individuals from 'exploratory rummaging' not supported by probable cause." *Id.* at 110-11 (quoting *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013)). By contrast, an arrest warrant "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *United States v. Bohannon*, 824 F.3d 242, 249 (2d Cir. 2016) (quoting *Payton*, 445 U.S. at 603).

When executing an arrest warrant in a residence, officers may conduct a "properly limited protective sweep," *United States v. Hassock*, 631 F.3d 79, 85 (2d Cir. 2011) (quoting *Maryland v. Buie*, 494 U.S. 325, 337 (1990)), but they must "supply specific and articulable facts warranting a reasonably prudent officer to believe that an individual posing a danger is lurking in an area to be swept," *id.* at 86. Moreover, "such a protective sweep, aimed at protecting the arresting officers, . . . is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be

-13-

found" and "lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017) (quoting *Buie*, 494 U.S. at 335-36).

Third, if an individual is lawfully detained during the execution of a search warrant, officers are not required to have "independent reasonable suspicion in order to question [an individual] concerning [his or her] immigration status." *Muehler v. Mena*, 544 U.S. 93, 100 (2005); *see id.* at 95-96 (upholding detention and questioning of individual present in home, where search warrant "authorized a broad search of the house and premises for, among other things, deadly weapons and evidence of gang membership"). At the same time, a seizure may become unlawful if an individual's "detention [is] prolonged by the questioning," *id.* at 101, and the "Fourth Amendment does provide protection against random or gratuitous questioning related to an individual's immigration status," *Rajah*, 544 F.3d at 441.

Fourth, "[s]tatements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights" under the Fifth Amendment pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

-14-

*United States v. Faux*, 828 F.3d 130, 134 (2d Cir. 2016).[4] Determining whether an

individual is in custody is "an objective inquiry that asks (1) 'whether a

reasonable person would have thought he was free to leave the police encounter

at issue' and (2) whether 'a reasonable person would have understood his

freedom of action to have been curtailed to a degree associated with formal

arrest.'" *Id.* (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)).

Finally, a search may not be based on "race" or other improper

consideration. *Cotzojay*, 725 F.3d at 180. As the Supreme Court has made

abundantly clear, stopping and interrogating people based solely on race or

ethnicity violates the Fourth Amendment. *See United States v. Brignoni-Ponce*, 422

U.S. 873, 885-86 (1975) (because "Mexican ancestry . . . alone [does not] justify . . .

a reasonable belief that [petitioners] were aliens," stopping and detaining a

person based solely on Mexican ancestry violates the Fourth Amendment).

---

[4]    *Muehler* only addressed the petitioner's Fourth Amendment rights and did not discuss any rights she may have had under *Miranda*. *See* 544 U.S. at 98-102. To the extent that the officers' questioning here fell outside the permissible bounds laid out by the Supreme Court in *Muehler*, however, we think *Miranda* warnings were arguably required. We leave the resolution of that question to the agency in the first instance, following an evidentiary hearing.

**2.**     *Application of the Exclusionary Rule to Removal Proceedings*

While the exclusionary rule does not usually apply to civil deportation proceedings, the exclusion of evidence *is* appropriate where there are "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness." *Lopez-Mendoza*, 468 U.S. at 1050; *see also Maldonado*, 763 F.3d at 159. This Court has interpreted *Lopez-Mendoza* to hold that the exclusion of evidence is warranted if the record shows either (1) "an egregious violation that was fundamentally unfair" or (2) a violation, which "regardless of its egregiousness or unfairness . . . undermined the reliability of the evidence in dispute." *Almeida-Amaral*, 461 F.3d at 235.

Petitioners rely only on the first category, an "egregious violation that was fundamentally unfair." *Id.* We use "a flexible case-by-case approach" to determine whether a seizure is the result of an egregious violation of constitutional rights. *Cotzojay*, 725 F.3d at 182 (citation omitted).

We have identified two non-exclusive inquiries to aid the determination of whether an "egregious violation" of constitutional rights has occurred. *Id.* at 180. First, "the egregiousness of a constitutional violation cannot be gauged solely on the basis of the validity (or invalidity) of the stop, but must

-16-

also be based on the characteristics and severity of the offending conduct."

*Almeida-Amaral*, 461 F.3d at 235. Second, a seizure may be an egregious violation, even when it is not "especially severe," if the seizure was "based on race (or some other grossly improper consideration)." *Cotzojay*, 725 F.3d at 180 (quoting *Almeida-Amaral*, 461 F.3d at 235). Factors we consider include "whether the violation was intentional; whether the seizure was 'gross or unreasonable' and without plausible legal ground; whether the invasion involved 'threats, coercion[,] physical abuse' or 'unreasonable shows of force'; and whether the seizure or arrest was based on race or ethnicity." *Id.* at 182 (quoting *Oliva-Ramos v. Att'y Gen. of U.S.*, 694 F.3d 259, 279 (3d Cir. 2012)). We have also observed that "'egregious' by definition is very bad indeed, and that the Supreme Court contemplated only such abuses as 'transgress notions of fundamental fairness.'" *Maldonado*, 763 F.3d at 159 (quoting *Lopez-Mendoza*, 468 U.S. at 1050).

The pre-dawn raid of a home without a warrant, consent, or reasonable suspicion is one example of an egregious violation. *See Cotzojay*, 725 F.3d at 183; *see also Lopez-Mendoza*, 468 U.S. at 1051 n.5 (discussing BIA precedent where suppression was warranted in "a night-time warrantless entry into the aliens' residence"); *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1018-19 (9th Cir.

-17-

2008) (holding that warrantless search of home without consent or exigent circumstances is egregious violation of the Fourth Amendment). We have also suggested that "some degree of physical threat or forcible contact" may be a basis for finding an egregious Fourth Amendment violation. *Cotzojay*, 725 F.3d at 182. And a seizure "based on race (or some other grossly improper consideration)" may constitute an egregious violation. *Id.* at 180 (quoting *Almeida-Amaral*, 461 F.3d at 235).

A petitioner seeking to suppress evidence in a removal proceeding initially bears the burden of coming forward with proof "establishing a prima facie case." *Matter of Barcenas*, 19 I. & N. Dec. 609, 611 (B.I.A. 1988) (quoting *Matter of Burgos*, 15 I. & N. Dec. 278, 279 (B.I.A. 1975)); *accord Cotzojay,* 725 F.3d at 178. A petitioner must first provide an affidavit that, taken as true, "*could* support a basis for excluding the evidence." *Cotzojay*, 725 F.3d at 178 (emphasis added) (citation omitted); *accord Maldonado*, 763 F.3d at 162. If the affidavit is sufficient, the petitioner is entitled to "an opportunity to confirm those allegations in an evidentiary hearing." *Maldonado*, 763 F.3d at 162. Once a petitioner makes out a prima facie case, the burden shifts to the Government "to show why the evidence in question should be admitted." *Cotzojay*, 725 F.3d at

178. In deciding whether the burden shifts, the evidence and facts alleged must be viewed "most favorably to [the] petitioner." *Almeida-Amaral*, 461 F.3d at 237.

**B.    *Application***

Viewing the facts set forth in the affidavits and Form I-213s in the light most favorable to petitioners, *see Almeida-Amaral*, 461 F.3d at 237; *Cotzojay*, 725 F.3d at 178, we conclude that petitioners made a sufficient showing of an egregious constitutional violation to warrant an evidentiary hearing: those facts *could* support a basis for excluding the evidence. *Cotzojay*, 725 F.3d at 178.

First, the facts set forth in the Form I-213s and affidavits, if true, show that the troopers and Border Patrol agents went to the house because they were looking for "known Hispanic migrants." The forms say as much. Even assuming the suspected presence of a fugitive was a reason for the search, the forms suggest that the presence of "known Hispanic migrants" was also a purpose. The forms do not, however, identify any specific or articulable facts to believe that anyone in the house -- other than the suspected fugitive -- had committed a crime. Moreover, petitioners' affidavits establish that they were questioned only after the troopers had determined that the suspected fugitive was not present; the Government has offered no explanation as to why the

-19-

agents decided at that point to ask petitioners about their country of citizenship and immigration status -- other than that the agents were looking for "Hispanic migrants." Hence, petitioners presented substantial evidence that the search was improperly based on race. *See Almeida-Amaral*, 461 F.3d at 235.

Second, although the Government relies on the existence of a "felony search warrant," petitioners have raised fair questions as to whether a warrant existed and, if so, whether the search exceeded its scope. Moreover, petitioners' affidavits, taken as true, establish that neither consent nor exigent circumstances existed to justify a warrantless search.

DHS did not provide a copy of the warrant. The Form I-213s refer only to a "felony search warrant," without specifying where and when it was issued, and without revealing its terms and scope. The Form I-213s seem to suggest that the warrant was issued in part because of the suspected presence of "known Hispanic migrants" in the residence. If that is the case, we have serious doubts as to the sufficiency of the application for the warrant. And it is unclear why, if the purpose was to apprehend a fugitive, a "felony search warrant" was issued rather than an arrest warrant. Petitioners have also raised a fair question as to whether the real purpose of the search was not to locate a fugitive but to

-20-

apprehend "known Hispanic migrants." The state troopers were accompanied by not one, but two Border Patrol agents. While the Form I-213s state that the agents were present to provide "translation assistance," it seems odd that the state troopers did not have their own interpreters and instead imposed on two agents from another, *federal*, law enforcement agency to provide translation services for one suspected fugitive. These facts support the notion that law enforcement was targeting Hispanic migrant workers from the start.

Moreover, even assuming the state troopers had a warrant, fair questions exist as to whether the interrogation exceeded its scope. Of course, this inquiry is made all the more difficult because the warrant has not been made available to examine. If, as the Government asserts, the warrant authorized a search of the home to apprehend a fugitive, once the law enforcement agents ascertained that the fugitive was not present, their mission was complete, and any subsequent questioning was arguably beyond the scope of the warrant. A fair question exists as to whether the agents had any proper basis under the warrant to question petitioners about their immigration status. Fair questions also exist as to whether petitioners were in custody when they were interrogated and whether the questioning was conducted in coercive circumstances.

Petitioners have attested to the fact they were rounded up by and questioned in the presence of police officers, and Hernandez-Ocampo attested that he was guarded by armed officers. These facts certainly suggest that petitioners did not feel free to leave the premises during the questioning.

As to consent to enter the home, petitioners aver in their affidavits that they did not consent to the search -- they were asleep in their room, they never opened the door to law enforcement officers, and the resident who opened the door did so apparently because he had "no choice." These facts are similar to those set forth in the affidavit in *Cotzojay*, a case in which the IJ held a suppression hearing. 725 F.3d at 175. There, petitioner stated in his affidavit that he was asleep in his bedroom and awakened by officers at 4 A.M. knocking on his window and yelling, "Police! Open up." *Id.* He saw the officers escort another resident out of the house, and then saw his sister-in-law close and lock the front door. *Id.* He then stayed in his room, and as a result did not know how or when the officers re-gained entry to the house. *Id.* The officer re-entered the house, however, and arrested petitioner. *Id.* at 174. The IJ "held a suppression hearing based on a 'preliminary ruling that [petitioner's] affidavit alone

constituted prima facie evidence' sufficient to entitle [petitioner] to a hearing." *Id.* at 175.

Third, petitioners presented sufficient evidence that, if credited, would show the agents engaged in severe conduct. This was a nighttime raid of a home, perhaps without a warrant or consent, and with a showing of physical force -- knocking on windows, shining flashlights into a bedroom, the surrounding of the house by police officers, armed with rifles, and the rounding up of seven residents. *See Maldonado*, 763 F.3d at 160 ("The affidavit in *Cotzojay* satisfied this test [for a suppression hearing] because it averred facts that were appalling under any standard: a 'deliberate, nighttime, warrantless entry into an individual's home without consent and in the absence of exigent circumstances.'" (quoting *Cotzojay*, 725 F.3d at 183)). Moreover, again, petitioners have presented evidence to suggest that the search was pretextual in the sense that the actual target was not a fugitive from justice but Hispanic migrant workers, and that race was a factor.

The Government insists on appeal that "nothing in the record provides the requisite egregious circumstances as to the officers' conduct necessary to mandate application of the exclusionary rule." Br. for Resp't at 7.

-23-

The BIA and the IJ concluded that petitioners presented "no evidence" that the law enforcement actions were motivated by race. App. 4; *see* App. 87. We disagree. In fact, the Form I-213s on their face suggest that law enforcement searched the house at least in part because "there were known Hispanic migrants" believed to be present. The involvement of Border Patrol agents and the circumstances described in petitioners' affidavits also support the assertion that the agents were acting based at least in part on race.

The Supreme Court has recognized that, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona v United States*, 567 U.S. 387, 407 (2012) (citing *Lopez-Mendoza*, 468 U.S. at 1038). "If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Id.* Here, there is no evidence in the record of any illegal activity on the part of petitioners, and on this record a reasonable fact-finder could conclude that they were targeted merely because they appeared to be Hispanic migrants. But being an Hispanic migrant is not a crime. *See Brignoni-Ponce*, 422 U.S. at 885-86 ("Mexican ancestry . . . alone [does not] justify . . . a reasonable belief that [petitioners] were aliens."). Allowing law enforcement officers to target people based solely on characteristics such as

ethnicity or national origin is to "condone ethnic harassment." *Maldonado*, 763 F.3d at 172 (Lynch, *J.*, dissenting). Indeed, "[i]mmigration enforcement that is based not on individualized suspicion but on ethnic generalizations teeters on the verge of 'the ugly abyss of racism.'" *Id.* at 174 (quoting *Korematsu v. United States*, 323 U.S. 214, 233 (1944) (Murphy, *J.*, dissenting), *abrogated by Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018)).

In the end, there may be legitimate, non-discriminatory reasons for the officers' actions here, and there may be specific and articulable reasons -- beyond the mere presence of "known Hispanic migrants" -- for their belief that a crime had been committed. But those reasons are not apparent from this record, and there was more than ample reason for an evidentiary hearing.

Accordingly, we hold that petitioners made a sufficient showing to warrant a suppression hearing.

*CONCLUSION*

For the reasons set forth above, the petition is GRANTED and the case is REMANDED to the BIA for proceedings not inconsistent with this opinion.