15-3728(L)
Rodriguez v. Barr

In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2017
Nos. 15-3728-ag, 17-273-ag

CHRISTIAN RODRIGUEZ,
*Petitioner*,

*v.*

WILLIAM P. BARR, United States Attorney General,
*Respondent.*

Appeal from
the Board of Immigration Appeals.
No. A088-190-226

ARGUED: MAY 1, 2018
DECIDED: NOVEMBER 21, 2019

Before: LYNCH and DRONEY, *Circuit Judges*, and SESSIONS, District Judge.[*]

_____

Petitioner Christian Rodriguez ("Rodriguez") brings two petitions for review. The lead petition, No. 15-3728, seeks review of a decision of the Board of Immigration Appeals ("BIA") denying Rodriguez's motion to suppress evidence of his alleged alienage based on an egregious violation of his constitutional rights. The second petition, No. 17-273, concerns the BIA's denial of Rodriguez's request for *sua sponte* reopening of his completed removal proceedings pending the outcome of a U-visa application. We **DENY** Petition No. 17-273 because Rodriguez's U-visa application has been denied. However, we **GRANT** Petition No. 15-3728 because we find that Rodriguez made a *prima facie* showing of an egregious violation of his Fourth Amendment rights, and **REMAND** the case to the BIA for additional proceedings.

_____

JOSEPH MEYERS, THOMAS SCOTT-RAILTON, Law Student Interns (Muneer I. Ahmad, Supervising Attorney, Adán Martínez, Richard Zacharias, Melissa Z. Marichal, Law Student Interns, *on the brief*), Jerome N. Frank Legal Services Org., Yale Law School, New Haven, CT, *for Petitioner*.

M. JOCELYN LOPEZ WRIGHT, Senior Litigation Counsel (Melissa Neiman-Kelting, Assistant Director, Office of Immigration Litigation, Chad A. Readler, Acting Assistant Attorney General, Civil Division, *on the brief*), Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., *for Respondent*.

_____

[*] Judge William K. Sessions III, of the United States District Court for the District of Vermont, sitting by designation.

2

SESSIONS, *District Judge*:

Petitioner Christian Rodriguez ("Rodriguez") brings two petitions for review. The lead petition, No. 15-3728, seeks review of the Board of Immigration Appeals' ("BIA") denial of Rodriguez's motion to suppress evidence of his alleged alienage. His second petition, No. 17-273, concerns the BIA's denial of Rodriguez's request for *sua sponte* reopening of his completed removal proceeding. We grant Petition No. 15-3728 and deny Petition No. 17-273.

**FACTUAL BACKGROUND**

I. **Facts Relevant to Petition No. 15-3728**

In 2007, the City of New Haven, Connecticut became the first city in the United States to approve a municipal ID card that would be available to undocumented residents.[1]  Then-mayor of New Haven, John DeStefano Jr., had aired the idea of a municipal ID card in 2005, and the plan had gained steam by early 2007.  In May 2007, DeStefano testified before a committee of the New Haven Board of Aldermen in support of a proposal, calling it an "issue of justice and an issue of human rights, just as was the case when generations ago the community

---

[1] The card could "be used in a variety of ways—as a debit card at businesses, drawing down on the money card holders put in their bank accounts, a library card, a card to pay the city's parking meters and as proof of residency for admission to city parks." App'x 340.

3

of New Haven engaged the captives of the Amistad.[2] If New Haven won't stand up, who will stand up[?]" App'x 326.

Officials at the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") were aware of the proposed ID card program. In fact, emails between ICE and DHS officials show that ICE had "concerns" about the plan. App'x 426. Three days after the *New Haven Register* published DeStefano's comments, an email between ICE officials described the ID program as follows: "Yale is loading up the Amistad with illegal aliens and sailing them to freedom, while John Marley [an ICE attorney in Hartford, Connecticut] openly weeps." *Id.*

The city's Board of Aldermen approved the municipal ID program on June 4, 2007. Approximately 36 hours later, federal agents conducted an early-morning raid in the city's largely Hispanic neighborhood, Fair Haven. Federal agents dressed in bulletproof vests entered multiple private homes, including a residence at 546 Woodward Avenue. Agents arrived at 546 Woodward Avenue in search of Jorge Barroso, an individual on their target list. 546 Woodward Avenue contains

---

[2] (The Amistad was a schooner on which African slaves escaped their shackles and took over the ship, ultimately gaining legal freedom in the process. *See United States v. the Amistad*, 40 U.S. 518 (1841).)

4

three apartments, and federal agents entered at least two of them (Units A and C). Agents knocked on the front door of Unit C, which was answered by the fourteen-year-old son of the apartment's main resident, Dora Riofrio. Riofrio's son was greeted by approximately eight agents who pushed past him into the apartment. *Id*. The agents then asked Riofrio the whereabouts of Jorge Barroso, her brother-in-law. *Id*. She told the agents that he was in Ecuador. *Id*. Nevertheless, the agents proceeded to go upstairs in the apartment and arrest her husband, Antonio Barroso. *Id*. One agent pushed Riofrio's minor son onto a couch. *Id*.

The agents also entered Unit A and arrested Carlos Aucapina. Aucapina's mother-in-law answered a knock at the front door of Unit A. Agents held up a picture of a man she did not recognize and asked if he lived in the apartment. *Id*. When she answered no, the agents pushed past her and entered the apartment. *Id*. Immediately before Aucapina's arrest, an immigration officer held up a picture of a target individual (who was not present) to Aucapina's face and stated to another agent, "[t]hey all look the same. Just arrest him." App'x 391. Aucapina's mother-in-law subsequently submitted an affidavit stating that immigration agents held up a photo of the target next to Aucapina and said, "[i]t could be him," even though the two men did not resemble each other "at all." App'x 389.

5

The municipal ID program, and the arrests that followed its passing, were widely covered by the press and discussed by local politicians, government leaders, and the community. Connecticut's then-Senators, Joseph Lieberman and Christopher Dodd, as well as the Congresswoman representing New Haven, Rosa De Lauro, wrote to the Secretary of Homeland Security asking whether the raids were planned in response to the municipal ID program and requesting an explanation of the timing of the raid. The mayor of New Haven has called the arrests "an act of intimidation" and "retaliation" for the introduction of the ID cards. App'x 328, 331. The police chief of New Haven publicly stated that he had not received notification prior to the raid, in violation of ICE policy. DHS denied that accusation.

DHS also denied that the arrests were retaliation for the ID card program. According to a letter written after the raids by the then-Assistant Secretary of Homeland Security, the plan for the New Haven raids was submitted on April 20, 2007 and approved on May 4, 2007. The Assistant Secretary asserted that the New Haven arrests were part of a larger enforcement initiative called "Operation Return to Sender" focused on the arrest of fugitive aliens. App'x 315. Of the approximately thirty people arrested in New Haven on June 6, 2007, only five had

6

outstanding deportation orders, and only one or two had criminal records. After the arrests on June 6, ICE temporarily postponed its fugitive search operations in Connecticut.

Petitioner Christian Rodriguez was arrested during these raids. At the time, Rodriguez was working in construction for Antonio Barroso, an independent contractor. The previous day, Barroso had allowed Rodriguez to borrow his car and keep it overnight. *Id.* When Barroso was arrested in the early morning of June 6, Rodriguez received a call asking him to return the car. Rodriguez understood that there were police officers at the house and Barroso needed to retrieve documents from the car. *Id*. After receiving the call, Rodriguez immediately got into the car, wearing sandals and the clothes he had slept in. *Id*. Rodriguez arrived at Barroso's residence around 7:00 a.m., approximately 30 minutes after Aucapina had been arrested. *Id*.

As Rodriguez pulled into the driveway, he noticed two "police officers" (actually ICE agents). App'x 253. Rodriguez parked, and the officers walked toward him until they were about two feet away. *Id*. Rodriguez did not feel that he was free to leave. *Id*.

Rodriguez is fluent in Spanish but not proficient in English. The officers began speaking to Rodriguez and conducted the conversation in English, though one officer spoke minimal Spanish and would restate some words in Spanish when Rodriguez indicated that he could not understand. *Id*. Rodriguez gave all of his answers in Spanish. *Id*. When one of the officers asked him what he was doing at the house, Rodriguez responded that he didn't live there but he was returning the car to his boss. *Id*. When asked for identification, Rodriguez told the officers he did not have it on him because he had rushed to the house after getting the phone call. *Id*.

Rodriguez was handcuffed, arrested, and charged with removability under 8 U.S.C. § 1182(a)(6)(A)(i) for being an alien present in the United States without being admitted or paroled, and brought to the Wyatt Detention Facility in Central Falls, Rhode Island. Rodriguez was detained at the facility for 21 days before being released on bond.

Following Rodriguez's arrest, immigration officers prepared a Form I-213, Record of Deportable/ Inadmissible Alien, on the same day, June 6, 2017. "A Form I-213 is an official record prepared by immigration officials when initially processing a person suspected of being in the United States without lawful

8

permission," which courts consider "presumptively reliable and admissible even absent the testimony of the officer who prepared it, unless the reliability of the form is somehow undermined." *Zuniga-Perez v. Sessions*, 897 F.3d 114, 119 n.1 (2d Cir. 2018) (internal citations and quotation marks omitted). The Form I-213 purporting to describe Rodriguez's arrest states, *inter alia*, that Rodriguez was encountered by immigration and other law enforcement agents "at his residence." App'x 245. It also states that "[c]onsent to enter the residence was given by an individual identified as Isadora Riofrio," and that Rodriguez made admissions concerning his alienage. App'x 245–46. As discussed below, the BIA later found this Form I-213 to be "unreliable" because it was inconsistent with Rodriguez's testimony and the findings of the Immigration Judge ("IJ"), App'x 40, and DHS subsequently withdrew any reliance on it.

In removal proceedings, Rodriguez filed a motion to suppress all evidence obtained from his arrest, including the Form I-213. He argued that the federal immigration agents who arrested him had egregiously violated his fundamental constitutional rights because, *inter alia*, he was seized, arrested, and detained based solely on race. In support of his motion, he submitted a declaration and numerous

9

other supporting exhibits. Rodriguez also testified at a hearing before an IJ, Michael W. Straus, in support of his motion.

The Government did not offer any testimony, from arresting officers or otherwise, to rebut Rodriguez's account of the arrest.  Rodriguez requested the IJ issue a subpoena for the testimony of the arresting officer.  The IJ declined to issue the subpoena.

On April 2, 2009, IJ Straus denied Rodriguez's motion to suppress and terminate his removal proceedings. The IJ found that Rodriguez was not a "particularly credible witness" because there were "gaps and contradictions" in his declaration and live testimony. App'x 83–84. For example, Rodriguez testified that the officers never asked him about his citizenship or alienage.  The IJ found this to be not credible: "[T]he Court is unable to determine if [Rodriguez] was questioned about his alienage . . . . While [Rodriguez] stated he was not asked where he was from, he was unsure if he said anything else." App'x 83. The IJ found that the discrepancies had "a detrimental impact on [Rodriguez's] burden of presenting a *prima facie* case that his constitutional rights were egregiously violated" because "the Court [was] unable to discern all of the relevant facts." *Id.*

10

Ultimately, the IJ held that the arrest was not an egregious violation of Rodriguez's constitutional rights because the officers "had reason to believe" Rodriguez was an alien illegally in the United States. App'x 85. The IJ relied on three facts to come to this conclusion: (1) Petitioner arrived at the site of an ongoing law enforcement operation driving a vehicle owned by another individual, (2) he did not have identification on him, and (3) he was unable to speak English. There is no evidence the Government knew of his citizenship or alienage status at the time of his arrest. Rodriguez filed a timely notice of appeal, and the case proceeded to the BIA.

The BIA found "no clear error" in the IJ's finding that Rodriguez presented inconsistent testimony but that the "record as a whole" was "inconsistent and unclear about what happened during the arrest." App'x 40. The BIA also found that the Form I-213 was unreliable and could not establish alienage for the following reasons:

> [B]oth the Immigration Judge's order and [Rodriguez's] many declarations of record indicate that the details of the June 6, 2007, arrest . . . are incorrectly set forth in the I-213. That is, the Immigration Judge and [Rodriguez] both describe the initial encounter between [Rodriguez] and immigration agents as occurring "outside the home of" [Rodriguez's] employer. This encounter apparently took place in a parking area behind the employer's home, not a "residence." Because no entry into a residence was necessary, the statement in the

11

I-213 that "consent to enter the residence was given by an individual identified as Isadora Riofrio" [also] appears to be untrue, at least as it relates to [Rodriguez].

The unreliability of the I-213's description of the arrest also calls into question what [the I-213 states] was said by [Rodriguez to immigration officers.]

. . . . Furthermore, the sequence of events [as found by the IJ] conflicts with the I-213, since on the one hand, [Rodriguez] is described as not being able to speak English, and on the other hand, the I-213 depicts [Rodriguez] as making admissions concerning his presence and alienage, but does not indicate the presence of an interpreter.

App'x 40–41. Given these findings, the BIA remanded to the IJ "to clarify, through [further] fact-finding, what occurred during [Rodriguez's] arrest," and "for the [IJ] to identify and assess the information that supports the finding of alienage, and then, if applicable, to decide whether that information can and should be suppressed pursuant to the exclusionary rule." App'x 42.

DHS filed a motion for reconsideration of the BIA's decision, which was denied. In its order denying the motion, the BIA elaborated on its reasons for remanding the case, explaining that it had "directed [the IJ] to specifically set out why [Rodriguez's] account of the arrest did not state that an egregious constitutional violation had occurred," because "in [the BIA's] view," Rodriguez's

12

submissions "on [their] face . . . raised allegations of an unlawful seizure." App'x 28.

On remand, DHS withdrew the Form I-213 as evidence and instead presented an Ecuadorian birth certificate[3] and criminal history print out as evidence of alienage. Rodriguez argued that this evidence was still "fruit of the poisonous tree" and should be excluded. Rodriguez submitted additional affidavits concerning ICE's alleged derogatory statements made in the course of the raids. The Government made no effort to produce the testimony of the arresting officers. The IJ found the birth certificate was "not tainted by unlawful or egregious actions by ICE" and that Rodriguez had not made a *prima facie* case of egregiousness. App'x 23.

Rodriguez again appealed to the BIA, and the BIA again remanded to the IJ for additional fact-finding. Specifically, the BIA instructed the IJ to find whether the new evidence submitted by DHS was independent source evidence or if it could be considered fruit of the poisonous tree. The BIA also instructed the IJ again to "clarify the findings about the circumstances of [Petitioner's] arrest," App'x 19, because the BIA apparently believed that the IJ had failed to comply

---

[3] The name on the birth certificate, "Cristian Rodriguez," does not match Petitioner's true name.

with its previously issued directive. *See* App'x 18–19 ("The Immigration Judge did not make any additional factual findings with respect to the circumstances of [Rodriguez's] arrest . . . [but] adhered to his previous holding that ICE agents did not commit an egregious violation of the Fourth Amendment[.]")

The case came before IJ Straus for the third time. The IJ concluded that the Ecuadorian birth certificate could be considered fruit of the poisonous tree. The IJ then examined the circumstances surrounding Rodriguez's arrest to see if it should be suppressed. The IJ assumed *arguendo* that Rodriguez was arrested without sufficient cause and that his seizure thus violated the Fourth Amendment's prohibition against unreasonable seizures. However, the IJ concluded that Rodriguez had "failed to establish a *prima facie* case that evidence of his alienage was obtained through an egregious and fundamentally unfair violation" of the Fourth Amendment. App'x 14.

Notwithstanding the prior concerns the BIA appeared to have harbored regarding the circumstances of Rodriguez's arrest, the BIA affirmed this decision on October 20, 2015. The BIA stated that it was assuming without deciding that Rodriguez had made a *prima facie* case of egregiousness. However, it then made a ruling that appears to be inconsistent with that assumption, holding that "the

14

record" of the arrest, which consisted only of Rodriguez's evidence, "supports the Immigration Judge's determination that the method by which the evidence was obtained by the immigration officers was not sufficiently egregious to apply the exclusionary rule." App'x 4.

## II. Facts Relevant to Petition No. 17-273

On September 12, 2016, nearly a year after the BIA had issued its most recent opinion in this case, Rodriguez filed an untimely motion with the BIA to reopen and administratively close his case or, in the alternative, to reopen and remand his case to the IJ for consideration of either administrative closure or a continuance. In August 2015, Rodriguez had submitted a petition for a U-visa to the United States Citizenship and Immigration Service ("USCIS") after having successfully obtained certification from the Queen's County District Attorney's office that he had been a victim of a crime in November 2011, helped the police identify the perpetrator, and was a willing sworn witness in the criminal trial. Rodriguez argued that his *prima facie* approvable U-visa petition constituted new evidence warranting the BIA's exercise of *sua sponte* authority to reopen and administratively close or continue proceedings.

15

On December 28, 2016, the BIA denied Rodriguez's motion, finding that he had not demonstrated exceptional circumstances justifying the exercise of the Board's *sua sponte* authority. The Board held that *Matter of Sanchez Sosa*, 25 I. & N. Dec. 807 (BIA 2012), upon which Rodriguez had relied in making his motion, did not apply to Rodriguez's case because Rodriguez had filed an untimely motion to reopen almost one year after the Board had issued its final administrative order, whereas the respondent in *Sanchez Sosa* had sought a continuance while his removal proceedings were still ongoing. *Id.*, *Sanchez Sosa*, 25 I. & N. at 808. Rodriguez then petitioned this Court for review of the BIA's denial. This Court consolidated this petition with Petition No. 15-3728, concerning Petitioner's motion to suppress.

On January 16, 2019, USCIS denied Rodriguez's U-visa application. Rodriguez timely filed motions to reopen and reconsider, which were also denied.

**STANDARD OF REVIEW**

This Court defers to the factual findings of the BIA and the IJ if they are supported by substantial evidence. *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 233 (2d Cir. 2006). Issues of law are reviewed *de novo*. *Id*. at 234. In cases where the BIA adopts and affirms the IJ's opinion and supplements it with its own conclusions,

the Court reviews the opinion of both the IJ and the BIA. *Matadin v. Mukasey*, 546

F.3d 85, 89 (2d Cir. 2008).

## DISCUSSION

This case consists of two consolidated petitions. The first petition (No. 15-

3728) presents the question of whether Rodriguez has made a *prima facie* case of an

egregious violation of his Fourth Amendment rights. The second petition (No. 17-

273) concerns the BIA's denial of an untimely motion for *sua sponte* reopening.

Petition No. 15-3728 is addressed first below.

### I.  **Petition No. 15-3728**

#### A.  **Mootness**

As a threshold matter, the Court must address the issue of mootness. The

Government argues that Petition No. 15-3728 is moot because Rodriguez has

admitted alienage in his U-visa application.[4] The Court finds that this admission

does not moot the current appeal.

The Government relies on decisions in which the petitioner admitted

alienage during removal proceedings and the Agency expressly relied on that

---

[4] The Government initially argued that Rodriguez's admission of Ecuadorian alienage at a voluntary departure proceeding moots the suppression issue. The government has since withdrawn that argument, correctly acknowledging that both the regulations and agency precedent prohibit using testimony provided for a voluntary departure application to establish alienage. Letter Confessing Error and

admission. Such is not the case here: The Government obtained the U-visa application after the issuance of the latest BIA order concerning Petition No. 15-3728. The U-visa application was never entered into the administrative record for that Petition, and neither the IJ nor the BIA ever relied on it when deciding the issue of Rodriguez's removability. Thus, the issue is not properly before us.

B. **Suppression of evidence based on an egregious violation of Rodriguez's constitutional rights**

Suppression of evidence is warranted in removal proceedings if the record establishes an egregious constitutional violation or a violation that undermines the reliability of the evidence in dispute. *Almeida-Amaral*, 461 F.3d at 235. A constitutional violation may be egregious "if an individual is subjected to a seizure for no reason at all . . . [and] the seizure is sufficiently severe." *Id*. (emphasis removed). Even if "the seizure is not especially severe, it may nevertheless qualify as an egregious violation if the stop was based on race." *Id*., *see also Zuniga-Perez*, 897 F.3d at 124 ("As the Supreme Court has made abundantly clear, stopping and interrogating people based solely on race or ethnicity violates the Fourth Amendment.") (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885–86 (1975)).

---

Withdrawal or Arg., Oct. 24, 2016, ECF 119; *see* 8 C.F.R. § 1240.49(e); *Matter of Bulos*, 15 I & N Dec. 645, 648 (BIA 1976) (interpreting former 8 C.F.R. § 242.17(d), now codified as 8 C.F.R. § 1240.49).

However, a petitioner who "offers nothing other than his own intuition to show that race played a part in the arresting agent's decision" does not establish an egregious race-based violation. *Almeida-Amaral*, 461 F.3d at 237.

In *Matter of Barcenas*, 19 I. & N. Dec. 609, 611 (BIA 1988), the BIA held that a respondent seeking to suppress evidence in a removal proceeding initially bears the burden of proof to establish a *prima facie* case. Under this burden-shifting framework, "if the petitioner offers an affidavit that 'could support a basis for excluding the evidence in question,' it must then be supported by testimony. If the petitioner establishes a *prima facie* case, the burden of proof shifts to the Government to show why the evidence in question should be admitted." *Cotzojay v. Holder*, 725 F.3d 172, 178 (2d Cir. 2013) (quoting *Barcenas*, 19 I. & N. Dec. at 611). Petitioners are "required to proffer affidavits based on personal knowledge that, taken as true, could support suppression." *Maldonado v. Holder*, 763 F.3d 155, 162 (2d Cir. 2014). "[T]he requisite 'personal knowledge,'" this Court has explained, "refers to information possessed by the [petitioner] who was subject to the alleged constitutional violation; it cannot extend to information the [petitioner] does not have." *Cotzojay*, 725 F.3d at 178. In deciding when the burden shifts, the evidence

19

and facts alleged must be viewed in the light most favorable to the petitioner. *Almeida-Amaral*, 461 F.3d at 237.

The issue before the Court is whether, assessing the evidence in the light most favorable to the Petitioner, Rodriguez established a *prima facie* case that his arrest was racially motivated and therefore constituted an egregious violation of his constitutional rights.[5]

To demonstrate the egregiousness of his arrest, Rodriguez submitted the following evidence concerning his arrest. Rodriguez was arrested during a widespread raid on a largely Hispanic neighborhood in New Haven. This raid, and his arrest, occurred a mere 36 hours after the city passed its immigrant-friendly municipal ID card program, which ICE officials were aware of and opposed. There is evidence that this raid was not announced to the New Haven Police Department, in violation of ICE policy. During this raid, only five of the approximately thirty people arrested had outstanding deportation orders, despite

---

[5] As stated above, there is an apparent inconsistency between the BIA's assuming that Rodriguez "demonstrated a *prima facie* case for suppression," App'x at 4, and its ruling in favor of the government notwithstanding that Rodriguez's evidence was uncontroverted. It is clear, however, that although the BIA stated it was assuming that Rodriguez had presented a *prima facie* case, it ultimately decided that Rodriguez's evidence was insufficient to discharge his burden. *See* App'x at 4-5. Therefore, we will address whether the BIA was correct, on the merits, to conclude that Rodriguez did not discharge his burden.

DHS's stated purpose in conducting this raid, which was to find "fugitive aliens." Rodriguez was arrested after arriving at 546 Woodward Avenue, where federal officers had entered apartments without consent or a warrant, and pushed a minor child. Officers made derogatory and racially discriminatory remarks about the Hispanic residents of 546 Woodward. While discussing one Hispanic man, an officer said, "[t]hey all look the same. Just arrest him." App'x 391. Read in the light most favorable to Rodriguez, this evidence tends to show a racial animus in the planning and execution of the raid during which Rodriguez was arrested, and thus supports the inference that Rodriguez's arrest was likewise race-based. *Cf. Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (observing in case brought under the Equal Protection Clause that, "[b]ecause discriminatory intent is rarely susceptible to direct proof, [courts] facing a question of discriminatory intent must make a sensitive inquiry into such circumstantial and direct evidence of intent as may be available") (internal quotation marks omitted).

The government argues that the circumstances surrounding the arrests of Barroso and Aucapina cannot support Rodriguez's claim that his arrest was egregious because petitioners "'may only litigate what happened to them.'" Respondent's Br. at 43 (quoting *INS v. Delgado*, 466 U.S. 210, 221 (1984)). But all

21

three arrests occurred during the same raid, at the same residential building, and in close temporal proximity. Accordingly, we find that the circumstances surrounding the arrests of Barroso and Aucapina are probative of "what happened to [Rodriguez]." *Delgado*, 466 U.S. at 221.

In addition to the events preceding Rodriguez's arrest, the particular circumstances of his arrest more directly support the inference that he was arrested based on his appearance. Specifically, the sheer paucity of evidence supporting a finding of probable cause buttresses the conclusion that the arrest was racially motivated. *See Yoc-Us v. Attorney Gen. United States*, 932 F.3d 98, 113 (3d Cir. 2019) (reasoning that the absence of a reason to extend a stop of petitioners, aside from their Hispanic appearance, could support the inference that the prolongation of the stop was race-based). In analyzing the specific circumstances of Rodriguez's arrest, the IJ relied on three pieces of information to conclude that the arresting officers had sufficient reason to believe Rodriguez was an alien illegally present in the United States: (1) he arrived at the site of an ongoing law enforcement operation driving a vehicle owned by another individual, (2) he did not have identification on him, and (3) he was unable to speak English. These facts clearly do not support a finding of probable cause for his arrest, however. Rodriguez

22

arrived at 546 Woodward Avenue to provide documentation from the vehicle so that his boss could respond to law enforcement inquiries. He also gave a reasonable explanation as to his lack of identification: He had rushed out of bed and into the car in order to help his boss as quickly as possible. Lastly, while Rodriguez is not proficient in English, this "same characteristic applies to a sizable portion of individuals lawfully present in this country." *United States v. Manzo-Jurado*, 457 F.3d 928, 937 (9th Cir. 2006) (finding that individuals' appearance as a Hispanic work crew, inability to speak English, proximity to the border, and unsuspicious behavior did not amount to reasonable suspicion that workers were in the country illegally); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 885–86 (1975) ("Mexican ancestry . . . alone [does not] justify . . . a reasonable belief that [petitioners] were aliens.").

The Form I-213 describing Rodriguez's arrest also supports the inference that the arrest was race-based. The BIA found, based on the IJ's findings and Rodriguez's testimony, that certain details of Rodriguez's arrest were "incorrectly set forth in the I-213," such as the location of the arrest, and that the "probative value of the I-213" was therefore "undermine[d]". App'x 28, 40–41. That Form I-213 was, as the BIA noted, prepared by immigration agents on the date of

23

Rodriguez's arrest and relied on by the Government to prove Rodriguez's alienage before the Government withdrew it. One can reasonably infer from the agents' preparation of an unreliable report at the time of the arrest, which would ultimately be used against Rodriguez, that the arrest was premised on an impermissible basis. And, given the other facts in this case, one can infer that this impermissible basis was race.

In sum, the evidence, read in the light most favorable to the Petitioner, suggests that his arrest was racially motivated. Accordingly, we find that Rodriguez has made out a *prima facie* case of an egregious violation of his constitutional rights. [6]

## II.    Petition No. 17-273

Generally, this Court reviews the BIA's denial of a motion to reopen for abuse of discretion. *Ali v. Gonzales*, 448 F.3d 515, 517 (2d Cir. 2006). Here, because Rodriguez's motion was untimely, it could only be granted through the BIA's exercise of its authority to reopen *sua sponte*. 8 C.F.R. § 1003.2(a). This Court is normally "without jurisdiction to review the Agency's failure to reopen removal

---

[6] Rodriguez also argues that the evidence of his alienage should be suppressed due to egregious violations of the First and Tenth Amendments. Having decided that he presented a *prima facie* case for suppression based on an egregious violation of the Fourth Amendment, we do not reach those arguments.

proceedings *sua sponte*." *Mahmood v. Holder* 570 F.3d 466, 469 (2d Cir. 2009). However, "where the Agency may have declined to exercise its *sua sponte* authority because it misperceived the legal background and thought, incorrectly, that a reopening would necessarily fail, remand to the Agency for reconsideration in view of the correct law is appropriate." *Id*.

In *Matter of Sanchez Sosa*, the BIA "articulate[d] the factors that an Immigration Judge and the Board should consider in determining whether an alien has established good cause to continue a case involving a U nonimmigrant visa petition." 25 I. & N. Dec. 807, 807 (BIA 2012). While stating that "Immigration Judges have broad discretionary authority over *continuances*," the BIA identified certain factors to determine whether good cause exists to "*continue* proceedings to await adjudication by the USCIS." *Id*. at 812 (emphasis added). These factors include "(1) the DHS's response to the motion; (2) whether the underlying visa petition is *prima facie* approvable; and (3) the reason for the continuance and other procedural factors." *Id*. at 812–13.

Rodriguez challenges the BIA's denial of his motion to reopen and for administrative closure or remand in the alternative, pending the adjudication of his U-visa application. The BIA denied Rodriguez's motion because it failed to find

25

extraordinary circumstances which it felt justified the use of *sua sponte* authority. The BIA did not apply the *Sanchez Sosa* factors, noting in its decision that *Sanchez Sosa* did not pertain to Rodriguez's situation because that case concerned a motion for continuance during a merits hearing, while Rodriguez's untimely motion was filed almost one year after the BIA issued its final administrative order. Rodriguez argues that this was a misperception of its announced policy and that the BIA should have applied the *Sanchez Sosa* factors.

Since USCIS denied Rodriguez's U-visa application, the Court does not need to reach the question of whether the *Sanchez Sosa* factors would apply to Rodriguez's case and whether the BIA erred in not applying them. Even if the BIA deviated from its own standard regarding U-visa petitions, that standard would no longer apply on remand and Rodriguez would not receive any relief. For this reason, Petition No. 17-273 is denied.

## CONCLUSION

For the reasons set forth above, we **GRANT** Petition No. 15-3728 and **REMAND** the case to the BIA for further proceedings in accordance with this opinion. Petition No. 17-273 is **DENIED**.

26